■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MORRIS LEISNER, Appellant. THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MAX MARX, Appellant.—Judgments, Supreme Court, New York County (James J. Leff, J.), rendered October 20, 1986, convicting defendants of conspiracy in the fourth degree and sentencing them to indeterminate terms of imprisonment of from 1 to 4 years, affirmed. The case is remitted to the Supreme Court, New York County, for further proceedings pursuant to CPL 460.50 (5).

The proof adequately demonstrated that from December 1978 to July 1980 defendants Leisner and Marx hired Morris Lender and Charles Lambert to move a gang of drug addicts, pimps, prostitutes, derelicts and thieves into apartment buildings owned by them in order to coerce the tenants into abandoning their apartments. If the tenants were not immediately frightened into moving by the mere presence of such miscreants, who openly used and sold drugs in the building and ran "shooting galleries" and prostitution rings, the gang was ordered to break into their apartments to steal or vandalize property. By July 1980, more than 100 tenants, the vast majority, had been driven from their homes. Although acquitted of attempted grand larceny (one count) and attempted coercion (one count), involving the same tenant as victim, both defendants were convicted of conspiracy to commit grand larceny in the first degree by extortion. The jury was unable to reach a verdict on the remaining substantive counts.*

---

* The jury's inability to reach a unanimous verdict on the substantive counts was almost certainly based on the different standards for finding

Of the many issues raised only two warrant discussion—the court's failure to charge the jury that the People must establish the commission of an overt act within five years of the indictment in order for it to find defendants guilty of conspiracy, and the refusal to charge on the possibility of multiple conspiracies. Defendants had submitted a written request that in order to convict, the jury "must find that the single overall conspiracy alleged * * * existed, and that each defendant joined that conspiracy."

We discuss the latter issue first. As defendants note, courts have held that if a reasonable view of the evidence exists to support a finding of multiple conspiracies, whether single or multiple conspiracies have been proven is generally a question of fact. *(See, United States v Alessi,* 638 F2d 466; *United States v Murray,* 618 F2d 892, 902.) Absent an evidentiary basis for a finding of multiple conspiracies, however, a court is not required to give the multiple conspiracy charge. *(See, United States v Martino,* 664 F2d 860, 875, *cert denied sub nom. Miller v United States,* 458 US 1110; *United States v Ocampo,* 650 F2d 421, 429.)

Here, the evidence established defendants' joint economic involvement throughout the conspiracy, and a careful coordination of all their activities to advance their joint goals. A finding of multiple conspiracies would thus have required an irrational segregation of the evidence. In any event, even if the evidence supported a finding of multiple conspiracies, the court's refusal to give the requested charge does not constitute reversible error. Only in instances where the variance between the pleading of a single conspiracy and the hypothetically assumed proof of multiple conspiracies "substantially prejudiced" the defendant's rights is reversal warranted. *(See, Berger v United States,* 295 US 78, 81; *United States v Miley,* 513 F2d 1191, *cert denied sub nom. Vavarigos v United States,* 423 US 842.)

Traditional harmless error analysis requires an examination of the conspiracy in which a defendant was proven to have been clearly involved, so as to determine whether the jury's consideration of that crime was tainted by a prejudicial spillover of inflammatory evidence related to separate conspiracies with which he was not involved. Inevitably, the likelihood of prejudice becomes greater as the number of defendants and

accomplice, as opposed to conspiratorial, liability under *People v McGee* (49 NY2d 48), rather than on any failure of proof regarding the coercion of these tenants.

discrete conspiracies, many of which are proven by evidence of a substantially different strength or quality, increases. *(See, United States v Bertolotti,* 529 F2d 149, 156-157; *United States v Miley, supra,* 513 F2d, at 1209.)

Under these standards, defendants here were not substantially prejudiced, even assuming that multiple conspiracies had been proven, although only one was alleged. As even defendants concede, they could have been tried jointly on a charge of conspiracy to vacate their jointly owned buildings. Since these buildings constituted 9 of the 16 buildings involved in the underlying charges, most of the evidence introduced at trial related to the conspiracy in which they were both involved. *(Contrast, United States v Cambindo Valencia,* 609 F2d 603, 626-627, *cert denied sub nom. Prado v United States,* 446 US 940, where the defendant in a multiple conspiracy case was overwhelmed with a mass of inflammatory testimony relating only to other defendants involved in other conspiracies.) Moreover, the evidence of the Lender-Lambert gang's criminal activities in defendants' jointly owned buildings was substantially identical to their criminal activities in defendants' separately owned buildings. *(See, United States v Miley, supra,* 513 F2d, at 1209; *contrast, United States v Bertolotti, supra,* 529 F2d, at 158.)

In addition, much of the evidence of defendants' activities in the separately owned buildings would also have been admissible in a trial involving only the joint buildings. At such a trial, for example, a critical issue would have been, as it was here, whether defendants knew that Lender and Lambert were vacating the jointly owned buildings through criminally coercive methods. Under *People v Molineux* (168 NY 264), defendants' knowledge that, during the same time period, criminal activities occurred in the separately owned buildings would have been admissible to prove their knowledge that the same methods were being used in the jointly owned buildings. Although we believe that the evidence was clearly sufficient to establish that defendants were involved in the single conspiracy alleged in the indictment, even if, arguendo, we accept the existence of multiple conspiracies, this case involved only two defendants, both of whom joined 1 of, at most, 3 separate conspiracies, all of which were proven by substantially similar evidence.

With respect to the other issue, defendants submitted a written request that the court charge that in order to find them guilty of conspiracy the People must establish the commission of an overt act after December 14, 1979. Such proof

would establish that the prosecution had been timely under the applicable Statute of Limitations, that is, within five years after the completion of the conspiracy. In that same written submission, defendants also requested a similar Statute of Limitations charge for each substantive count, so as to require a finding that these crimes had been committed after December 14, 1979.

Although the trial court correctly charged that the People must prove, as an element of the crime, the commission of one overt act in furtherance of the conspiracy, it did not mention the Statute of Limitations in this context. Defendants argue that such failure constitutes error mandating reversal. Upon review of the record, we find that defendants effectively withdrew their request and thus waived any objection to the court's failure so to charge.

After reviewing defendants' written requests, the Trial Judge endorsed on most of them either "covered by charge" or "refused", and made his annotated copy a court exhibit. He did not, however, so mark defendants' Statute of Limitations request; instead, he underlined the relevant date constituting the limitation deadline. Thus, at the outset, the Trial Judge did not reject defendants' request for the limitation instruction, but was apparently relying on the oral charge conference to clarify whether defendants actually wanted their request to cover each count.

During the oral charge conferences before and after summations, neither defense counsel ever mentioned his overt act Statute of Limitations charge. Nor did they request a Statute of Limitations charge for each substantive count. Rather, when the issue arose, counsel focused only on the two substantive counts involving Ion Burta as the victim, arguing that these counts must be dismissed since the crimes occurred prior to December 14, 1979. Defendants' concentration on the Burta counts was understandable, since the West 53rd Street building in which Burta lived was sold on December 19th, only five days after the Statute of Limitations deadline. Although Burta lived in the building for two more months, a sharp factual dispute existed as to whether Burta was subjected to any coercion after he signed a surrender and release on December 6, 1979. After a lengthy argument, the Trial Judge determined that with respect to the Burta counts a factual issue was raised as to the Statute of Limitations and he charged the jury accordingly.

Much later in the charge conference the following colloquy occurred between Marx's counsel and the Judge:

"[COUNSEL]: * * * Judge I have an additional charge today that I made about 1:30 this morning and what it simply is, because I take it you're going to charge on the statute of limitations as a factual matter, aren't you?

"THE COURT: With respect—it applies apparently, only to the testimony on Burta.

"[COUNSEL]: Well, there is another aspect, judge. I think if they were to find that there is not an overall conspiracy * * * 23rd Street and 30th Street would both be barred, time barred. That's the only thing that brings it within the time * * *

"If the jury were to find there was not a single conspiracy * * * point out to them, 23rd Street becomes an island of itself and so does 30th Street. They are barred from the statute of limitations."

In this colloquy Marx's counsel did not request that the jury be given a Statute of Limitations instruction on the single conspiracy charged in the indictment, as defendants now argue. Instead, he continued to press his multiple conspiracy argument in another form. Moreover, by claiming that only the allegedly separate conspiracies involving 23rd Street and 30th Street were time barred, he, in effect, conceded that the Statute of Limitations was not a viable defense to the indictment's charge of a single conspiracy, which, as the People's evidence showed, had extended past the limitation deadline. This is further supported by the ensuing colloquy:

"THE COURT: If you have a continuing conspiracy then those were overt acts that were committed and, the conspiracy continues so that the overt act isn't time barred from being considered as part of the conspiracy.

"[COUNSEL]: I agree, your Honor, on the overall conspiracy theory."

Apparently, after the lengthy charge conference, the Trial Judge thought defendants had narrowed the scope of their written submission and had requested a Statute of Limitations charge only on the Burta counts, which he had agreed to give. Defense counsel never alerted the Judge that as to the conspiracy count they still sought the Statute of Limitations charge which had been included in their written request. Nor did they mention anything about the Judge's omission of this instruction after he charged the jury. Rather, the postcharge colloquy makes it even clearer that they had withdrawn their request for such an instruction. Since the Judge had not marked "refused" on defendants' requests, had defense coun-

sel at this point drawn his attention to it, the Judge presumably would have given the instruction. When they asked to review their written requests, the Judge was at first reluctant, since he had already marked on their written submission the requests he had refused, which, as already noted, did not include the overt act Statute of Limitations instruction. It was in this context that the Judge stated that "to the extent" he did not follow defendants' written requests "they are a part of your exceptions". Defense counsel nevertheless insisted on reviewing their exceptions seriatim. Although they then presented 21 exceptions to the charge as given, the discussion of which consumes 20 pages of the record, they never again mentioned the Statute of Limitations request. Thus, the Judge could reasonably have concluded that defendants had limited their request to the two Burta counts. By never informing the Judge during the trial that they still desired the conspiracy limitation instruction, they waived any objection to the Judge's failure to give this instruction. (See, People v Lipton, 54 NY2d 340, 351.)

Indeed, People v Le Mieux (51 NY2d 981), which also dealt with the submission of written requests, provides an illustrative contrast. In Le Mieux, the court noted that defense counsel's failure at a very brief postcharge colloquy to mention a particular written request for the instruction at issue "without more * * * hardly demonstrated a clear intent to waive a position already preserved with respect to a request on which the verdict could very well have turned." (Supra, at 983.) Here, the record contains more than defendants' failure to raise the conspiracy limitation request specifically at the postcharge colloquy as proof of abandonment. They effectively expressed satisfaction with the Judge's interpretation of their request after extensive colloquy and his ultimate decision to charge the Statute of Limitations only on the Burta counts. Their failure to request the conspiracy limitation instruction at that juncture must be interpreted as a conscious abandonment, rather than oversight.

Moreover, neither the majority nor the dissenters in Le Mieux (supra, at 983) could discern any rational strategic reason in a perjury case for a lawyer to abandon a corroboration instruction "on which the verdict could very well have turned." Here, defendants' withdrawal of their request is entirely understandable, since numerous overt acts within the limitations period were proven by documents and testimony which went unchallenged. Defendants' trial strategy was based, not on disputing the overwhelming array of evidence

that Lender and Lambert had terrorized their tenants, but on vigorously disputing that either defendant was aware of their agents' criminal activity. Such a strategy dictated that the jury's attention not be drawn to the long litany of overt acts which might divert the jurors from a consideration of defendants' claim of lack of scienter.

Indeed, Marx's counsel was upset at the court's reading of the overt acts to the jury during its instruction on the conspiracy count, describing it as "almost like another summation for the People". Had a limitation instruction on the conspiracy count been given, requiring the jurors to focus on the date of each specific act, they could have requested a reading of the testimony as to the list of overt acts which defense counsel felt was too prejudicial to present even by a reading of the indictment. Furthermore, their abandonment of the conspiracy limitation charge could have no impact on the result. Proof of a timely overt act is required in a conspiracy prosecution "simply to manifest" that the conspiracy has advanced beyond "a project still resting solely in the minds of the conspirators" and is still " 'at work' " within the applicable limitation period. *(Yates v United States,* 354 US 298, 334.) After weighing the extreme unlikelihood of an acquittal of the conspiracy count based on a Statute of Limitations defense against the risk of what they believed would be substantial prejudice from the jury's focus on the overt acts, defendants apparently decided to forego their Statute of Limitations request on the conspiracy count. Having pursued such a strategy, defendants cannot now complain that they were prejudiced by the trial court's failure to give the instruction.

Since the record is replete with evidence of numerous overt acts committed after December 14, 1979, there is no need for this court to exercise its interest of justice jurisdiction to reach the issue of the failure to charge the Statute of Limitations in connection with the conspiracy charge. The People, for instance, proved by documentary evidence that defendants purchased the jointly owned buildings at Ninth Avenue and 48th Street on January 4, 1980, which was within the limitation period. Furthermore, Marx specifically admitted in his testimony that he and Leisner were the principals of Hodraw Realty and therefore the owners of said premises. Thus, proof of even one overt act committed in vacating these buildings would clearly meet the People's burden in this regard.

In fact, though, the People proved numerous overt acts. For instance, on the same date that they purchased the buildings, defendants registered Morris Lender as the managing agent.

Moreover, in his testimony Marx conceded that Lender had been installed in these buildings and was managing them for defendants. Defendants' registration of Lender as their managing agent was also an act "in furtherance of the conspiracy", since they thus gave him access to the buildings and clothed him with authority as their legal representative to pursue his tactics. By making Lender the person visibly responsible for conditions at the buildings, moreover, defendants hoped to shield themselves from responsibility for his actions. The commission of this overt act within the limitation period was not disputed by defendants.

Additionally, after defendants purchased Ninth Avenue/ 48th Street and installed Lender as their agent, Lambert moved his gang of thugs to the building. The tenants and a local tenant organizer soon noticed the arrival of new drug addict and prostitute tenants shortly afterwards. The usual pattern of harassment then commenced. The tenants confronted gang members loitering in the hallways and congregating on the roof, and found empty glassine envelopes, used hypodermic needles and garbage scattered throughout the building. Eventually the front door lock was broken and the door glass shattered, with the inevitable ensuing pattern of robberies and break-ins. Consistent with their strategy, defendants did not dispute that thugs were installed in these buildings, but, instead, consistently concentrated their efforts on proving their lack of knowledge. Thus, substantially undisputed evidence proved that in furtherance of the conspiracy overt acts were committed within the limitation period.

Thus, the convictions should be affirmed. Concur—Sullivan, J. P., Ross and Kassal, JJ.

Rosenberger, J., dissents in a memorandum as follows: I dissent because I disagree with the conclusion of the majority that defendants withdrew their request for an instruction on the applicability of the Statute of Limitations to the conspiracy count, the only count on which defendants were convicted. The majority appears to base its conclusion on defendants' failure to remind the court of their request during colloquy had immediately before summations and immediately after the charge. While it is true that defendants never mentioned the request after having submitted it in writing, they were under no obligation to do so on penalty of waiving the legal point raised therein. On the contrary, the obligation was on the court to rule on the request promptly after its submission, and its failure to do so entitled defendants to assume that the request had been denied (CPL 300.10 [5]). Nor were defendants

required to renew the request after the charge was given in order to preserve for appellate review the error caused by its omission from the charge (CPL 470.05 [2]).

The standard to be applied in determining whether defendants withdrew their request is "clear intent" *(People v Le Mieux,* 51 NY2d 981, 983), a standard entailing a degree of explicitness not demonstrated in the record. At the precharge conference, the Statute of Limitations was first mentioned by defendant Marx's counsel when he inquired of the court as to whether it was "going to charge the statute of limitations as a factual matter". The court responded by expressing the opinion, concededly erroneous, that a limitations issue existed only with respect to the counts of the indictment naming Ion Burta as a victim. Burta was a tenant in one of the buildings jointly owned by defendants as to whom a close factual dispute was raised concerning whether any criminal acts were committed by defendants' alleged coconspirators within the limitations period. Responding to the court, defendant Marx's counsel stated that his concern was with "another aspect" of the limitations issue, to wit, the legal effect of a jury finding that a separate conspiracy existed as to Marx's separately owned buildings. Marx's point was that had the indictment included, as he throughout argued it should have, a separate conspiracy count naming only the buildings separately owned by him, such a count would have been barred by the Statute of Limitations since the indictment did not allege the commission of any overt acts with respect to Marx's separately owned buildings within the limitations period. Rejecting the possibility that there were multiple conspiracies and adhering to its view that the evidence showed only a single, "continuing conspiracy", the court then indicated its understanding that a single, timely overt act with respect to any of the buildings was an adequate basis for submitting to the jury proof of untimely overt acts committed with respect to Marx's separately owned buildings. Such colloquy shows that the attention of the court and parties was focused, at this point, not on the applicability of the Statute of Limitations to the single conspiracy alleged in the indictment, but rather on whether there were multiple conspiracies, and what the legal effect would be of a jury finding that there were. Taken in the context of the entire precharge conference, the colloquy hardly suggests that defendants were withdrawing their limitations request, or, for that matter, any of their other previously submitted written requests not mentioned during the discussions. Nothing else was said remotely bearing on the Statute of Limitations prior to the reading of the charge.

After the reading of the charge, the court invited exceptions. Before taking those of defendants, the court made reference to the marking of their requests as a court exhibit, and advised them that "to the extent that I did not follow them * * * they are a part of your exceptions." Counsel for defendant Marx, citing *People v Hoke* (62 NY2d 1022), then asked the court for permission to "go through every one", apparently referring to his written requests. To this the court responded, "You don't have to, I don't know if you looked at it [referring to the defense requests marked as court exhibits], [but] I endorse[d] on most of them, covered by charge or reduced *[sic,* probably refused]. You're welcomed *[sic]* to look at them." It should be noted that while defendants' requests were marked as court exhibits during the precharge conference, the record does not indicate that the court had annotated them by then, or that defense counsel ever saw the annotated copies. The first time the court made reference to its annotations was in the above colloquy, after the charge had been given, and, certainly, at no time did the court ever tell defense counsel to look at its annotations and make their requests or exceptions in light of them. What counsel for defendant Marx did do was beg the court's indulgence and again request permission to present specific exceptions to the charge, and the court, apparently relenting, now invited him to do so. Counsel for Marx, followed by counsel for defendant Leisner, then presented various exceptions, but neither mentioned the court's omission of the requested instruction on the applicability of the Statute of Limitations to the conspiracy count.

I disagree with the majority that this postcharge colloquy "makes it even clearer that [defendants] had withdrawn their request". Under *People v Hoke (supra),* when the Trial Judge denies a requested instruction but then gives a different instruction on the same subject without a defense exception, there is preservation only as to the requested instruction but not as to the instruction as given. And, under *People v Whalen* (59 NY2d 273), when the Trial Judge grants a request to charge and then fails to deliver the charge as requested, the requesting party, in order to avoid a waiver of any objection to the instruction, must bring the variance to the Judge's attention and explain why the charge as given was inadequate. Given such preservation rules, once the court chooses to speak to a particular point in its charge, prudence dictates that counsel speak to the same point should the court's rendition be less than satisfactory. However, should the court not speak

to a particular point, the preservation rules set out in *Hoke* and *Whalen* do not come into play, and, provided there was a request for an instruction on that point, counsel ought to be able to rest assured that no further argument is needed in order to preserve the error caused by the court's failure to speak to the point. Since the court here did not in any manner cover in its charge the Statute of Limitations as it applied to the conspiracy count, defendants' request for an instruction on that point was all that was required for its preservation.

The failure to charge the limitations issue was not harmless since most of the overt acts submitted to the jury involved conduct that occurred outside the limitations period, and the general verdict returned by the jury makes it impossible to know with reasonable certainty whether the jury had found the commission of at least one timely overt act. Uncertainty in this regard is heightened by the failure of the jury to convict on any of the substantive counts *(see, United States v Head,* 641 F2d 174, 178-179, *on remand* 697 F2d 1200, *cert denied* 462 US 1132).

For these reasons, I would reverse defendants' conviction on the conspiracy count and remand for a new trial. In so doing, I would also direct the trial court, on remand, to charge another instruction requested by defendants that there could be no conviction for conspiracy without a finding that each defendant joined in the single, over-all conspiracy alleged in the indictment, and that if there was more than one conspiracy, neither defendant could be convicted unless at least one of the conspiracies was the conspiracy alleged in the indictment.

I think the majority overstates the strength of the People's case in asserting that the record does not contain an evidentiary basis for a finding of more than one conspiracy. At best, the record is ambiguous on this point, and where there is ambiguity as to the scope of the agreement made by a particular defendant, a multiple conspiracy charge such as defendants requested should be given *(see, United States v Varelli,* 407 F2d 735, 746; *United States v Alessi,* 638 F2d 466, 472; *United States v Alberti,* 727 F2d 1055, 1059 ["The determination of whether there are one or more conspiracies in a given case is a classic jury question."]). Such a charge informs the jury that the scope of each defendant's agreement must be determined individually from what was proved as to him, and allows it to decide the question of guilt on other than an all-or-nothing basis as to all defendants *(United States v Borelli,*

336 F2d 376, 384-387, *cert denied sub nom. Cinquegrano v United States,* 379 US 960).

Indeed, the People's argument gives short shrift to the question of whether defendants, as charged, drew together in a single, comprehensive plan to vacate all of the buildings mentioned in the indictment. Instead, their argument largely assumes that the omission of a multiple conspiracy instruction was error, but asserts that the error was harmless since the proof was such that the jury would have convicted defendants in any event for conspiring to vacate their jointly owned buildings. Whether defendants were prejudiced by the failure to charge on multiple conspiracies is a question which need not be addressed in detail, inasmuch as I am of the view that there should in any event be a remand and new trial on other grounds. Suffice to say that given an issue as to the scope of each defendant's agreement, it is always better that the jury be charged on multiple conspiracies. Among other things, such a charge would obviate the very question of prejudice which the majority is now obliged to address.